**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

PRINCE JOHNSON,

        Plaintiff,

        v.

THOMAS E. PEREZ, SECRETARY,
U.S. Department of Labor

        Defendant.

Civil Action No. 11-cv-1832  (KBJ)

## MEMORANDUM OPINION

Plaintiff Prince Johnson is an African-American man who was employed for approximately seven months—from April 2, 2006, until November 11, 2006—as a Veterans Employment Specialist in the Veterans Employment and Training Services ("VETS") division of the Department of Labor ("DOL" or "Defendant") before his employment was terminated.[1]  Johnson has brought the instant action against DOL, alleging two counts of employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17.  In the first count of his complaint, Johnson alleges that his termination was due to his race.  In the second count, Johnson alleges that he was subjected to a hostile work environment on account of his race during the course of his employment.

Before this Court at present is Defendant's Motion for Summary Judgment on both counts.  (Def.'s Mot. for Summ. J., ECF No. 14 at 1-2.)  In that motion, Defendant

---

[1] According to its website, VETS "serves America's veterans and separating service members by preparing them for meaningful careers, providing employment resources and expertise, and protecting their employment rights."  *See* http://www.dol.gov/vets/ (last visited Sept. 2, 2014).

maintains that the undisputed record evidence demonstrates that Johnson was terminated for legitimate, non-discriminatory reasons, and that Johnson has failed to produce sufficient evidence to establish that he was subjected to a hostile work environment. Because this Court concludes that there is no genuine issue of material fact as to whether Johnson experienced race discrimination or was subjected to a hostile work environment, and that Defendant is entitled to judgment as a matter of law, it will **GRANT** Defendant's motion as to both of Johnson's claims. A separate order consistent with this Opinion will follow.

## I.     BACKGROUND

### A.     Factual Background

Johnson's tenure at VETS was brief, and the undisputed material facts underlying his lawsuit are equally so. Johnson was initially hired as a Veteran's Employment Specialist within VETS in April of 2006. (Suppl. Decl. of Complainant Prince Johnson ("Pl.'s Suppl. Decl."), Ex. 1 to Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF No. 16-1 at 2-11, ¶¶ 4, 6; *see also* Def.'s Statement of Undisputed Material Facts ("D-SOF"), ECF No. 14 at 3-9, ¶ 6.)[2] Johnson's initial appointment was a temporary Veterans Readjustment Appointment ("VRA") scheduled to last for 60 days with the possibility of an extension or conversion to a career conditional appointment. (*See* Pl.'s Suppl. Decl. ¶ 6; *see also* D-SOF ¶ 6.)

Gordon Burke, an African-American man who was VETS's Director of Operations at the time, was the agency official responsible for hiring Johnson. (D-SOF ¶ 2.) Prior to his hiring, Johnson interviewed with both Burke and Pamela Langley, a

---

[2] Page numbers throughout this Opinion refer to the page numbers generated by the Court's electronic filing system.

Caucasian female who served as Johnson's first-line supervisor during his employment with VETS. (*Id.* ¶ 4.) At the interview, Langley informed Johnson that his primary responsibility would be to assist Langley's subordinate, Patrick Hecker, with developing and maintaining Excel spreadsheets related to VETS's "Jobs for Veterans" program. (*Id.* ¶ 5.) After the interview, Langley told Burke that, based on Johnson's resume, she believed that Johnson had enough experience to be able to perform the tasks required for the position successfully. (*Id.* ¶ 4.) Shortly thereafter, Burke hired Johnson. (*Id.* ¶ 6.)

Johnson's relationship with his new supervisors got off to a rocky start. A few weeks into Johnson's tenure, Hecker, who is a Caucasian man, reported to Langley that Johnson was having difficulty completing his assignments on time and without errors, and that Johnson had reacted defensively when Hecker tried to discuss these performance issues with him. (*Id.* ¶ 7.) Langley then raised concerns about Johnson's work in a meeting with Burke, and recommended that Johnson receive Excel and other general training. (*Id.* ¶ 9.) In May of 2006, Johnson also met with Burke and told Burke that Johnson was not getting appropriate support from Hecker and Langley and, consequently, felt like he was being "set up to fail." (*Id.* ¶ 10; *see* Pl.'s Suppl. Decl. ¶ 65.) Burke then convened a meeting with Johnson, Hecker, and Langley to discuss reported issues with Johnson's performance. (D-SOF ¶ 11; Pl.'s Suppl. Decl. ¶ 31.) At the meeting, Burke directed Johnson to undertake the training activities Langley recommended, including a basic-level course in Excel, and Johnson eventually did so. (D-SOF ¶¶ 11, 15; Pl.'s Suppl. Decl. ¶¶ 31-32.)

Notwithstanding Johnson's additional training, his professional relationship with Hecker and Langley continued to deteriorate.  At one point, Langley returned from leave to find that on June 30, 2006, in Langley's absence, Burke had authorized the conversion of Johnson's temporary appointment to a career conditional appointment when Burke signed paperwork that he believed was urgently necessary for Johnson to receive his next paycheck.  (D-SOF ¶¶ 16-18; *see also* Pl.'s Suppl. Decl. ¶ 7.)  Langley subsequently spoke to Burke and recommended that Johnson's appointment remain temporary because of ongoing performance issues.  (D-SOF ¶ 18.)  Burke then contacted the human resource office and requested that the office cancel Johnson's conversion to career conditional status.  (*Id.* ¶ 19.)

Although Hecker, Langley, and Johnson met several times between July and October of 2006 to discuss Johnson's performance and his "argumentative demeanor[,]" (*Id.* ¶ 22; *see* Pl.'s Suppl. Decl. ¶ 61), these sessions apparently did not mitigate the problems, and on October 6, 2006, Langley informed Johnson that she would be recommending to Burke that Johnson be terminated.  (D-SOF ¶ 23; Pl.'s Suppl. Decl. ¶ 33.)  On October 10, 2006, Johnson received a letter from Burke notifying him of Burke's decision to terminate Johnson's employment, effective November 11, 2006. (D-SOF ¶ 25.)

## B.    Procedural History

After exhausting his administrative remedies, Johnson filed the instant complaint in this Court on October 17, 2011, alleging that Defendant violated Title VII with respect to both Johnson's termination and to the conditions of Johnson's employment.

(Compl., ECF No. 1, ¶¶ 74-75, 77.)[3]  The complaint alleges that Johnson's termination was the result of discrimination based on his race (Count I), and also that Johnson was subjected to a hostile work environment because of his race while employed at VETS (Count II).  (*Id.*)

In the instant motion for summary judgment, which was filed on December 11, 2012, Defendant contends that judgment should be granted in its favor on both counts. Defendant argues that Count I cannot withstand summary judgment because DOL has articulated legitimate, nondiscriminatory explanations for Johnson's termination— namely Johnson's poor work performance and argumentative demeanor—and Johnson has failed to show that this explanation was merely pretext for race discrimination. Count II must also fall, Defendant claims, because the record evidence is insufficient to support Johnson's claim that he faced a hostile work environment while employed at VETS.  In response, Johnson asserts that he has identified evidence sufficient to create a triable issue of fact regarding whether Defendant's legitimate, nondiscriminatory explanations were a pretext for race discrimination, and that the record evidence shows that Johnson experienced working conditions that were sufficiently severe and pervasive to constitute a hostile work environment.

This Court has reviewed the entirety of the record, and has concluded that Johnson has failed to raise a question of material fact as to whether DOL's proffered reasons for Johnson's termination were a pretext for race discrimination.  Johnson

---

[3] Defendant does not dispute that Johnson properly exhausted his administrative remedies, including participating in counseling, filing an EEOC charge, and receiving notice of his right to sue.  (*Compare* Compl. at 2, ¶ 1 (stating that "Johnson filed an EEOC complaint and properly exhausted his administrative remedies"), *with* Answer, ECF No. 7, 1 (admitting same); *see also* EEO Counselor's Summ. Report, Ex. 18 to Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF No. 16-3 at 28-30 (describing EEO counseling).)

offers no evidence that racial animus was at the root of the allegedly discriminatory treatment, and especially in light of the fact that Johnson was hired and fired by the same persons—one of whom was African American—Johnson has failed to produce facts from which a reasonable jury could infer that his superiors' actions were because of race. The Court further concludes that Johnson has failed to support his hostile work environment claim because the acts on which Johnson bases his claim are not sufficiently severe and pervasive to meet the high standard for such claims. Thus, as explained further below, this Court will enter summary judgment in favor of Defendant on both counts.

## II.    LEGAL STANDARD

The Court must grant summary judgment if the moving party demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Under Rule 56, the moving party has the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). Although the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inference in that

party's favor, *see, e.g.*, *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23 (D.C. Cir. 2013), the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position. *Anderson*, 477 U.S. at 252. Rather, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Id.* Moreover, the non-moving party "may not rest upon mere allegation or denials of his pleading but must present affirmative evidence showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (internal quotation marks and citation omitted).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (citation omitted). Accordingly, a court's role in deciding summary judgment is not to "determine the truth of the matter, but instead [to] decide only whether there is a genuine issue for trial." *Id.* Given "the potential difficulty for a plaintiff in an employment discrimination or retaliation action to uncover clear proof of discriminatory or retaliatory intent," *Nurriddin v. Bolden*, No. 04-2052, 2014 WL 1648517, at *5 (D.D.C. Apr. 25, 2014), this Court reviews a defendant's motion for summary judgment in a discrimination case with a slightly "heightened standard[,]" *Walker v. England*, 590 F. Supp. 2d 113, 133 (D.D.C. 2008) (citation omitted). However, despite the fact that "summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of his obligation to support his allegations" with competent evidence showing a genuine issue for trial. *Id.* at 132-133 (quoting *Morgan v. Fed. Home Loan Mortg. Corp.*, 172 F. Supp. 2d 98, 104

(D.D.C. 2001)); *see also Marshall v. James*, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (noting that, even though courts must proceed with caution, summary judgment is still used in discrimination cases).

## III.    ANALYSIS

### A.    Johnson's Title VII Race Discrimination Claim (Count I)

Johnson first contends that DOL subjected him to discrimination because of his race.  (Compl. ¶¶ 74-75.)[4]  While there may well be a genuine issue of fact regarding whether Defendant's stated non-discriminatory reasons for terminating Johnson are, in fact, the actual reasons, Johnson has not offered sufficient evidence to support the conclusion that Defendant's proffered reasons are pretext *for race discrimination*. Accordingly, this Court finds that Johnson's race discrimination claim cannot survive Defendant's motion for summary judgment.

#### 1.    Legal Framework For Employment Discrimination Cases

Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Title VII "establishes two elements for an employment discrimination case: (i) the plaintiff suffered an adverse employment action (ii) because of the employee's race, color, religion, sex, or national origin."  *Brady v. Office of the Sergeant at Arms,* 520

---

[4] Johnson's complaint, which alleges that Defendant "subjected [Johnson] to unlawful discrimination" by "subjecting him to disparate treatment *and* terminating his employment" (Compl. ¶ 74 (emphasis added)), could reasonably be construed as asserting claims based on adverse actions other than his termination.  However, in his opposition brief, Johnson appears to concede that his termination is the only adverse action at issue in this case.  (*See* Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Br."), ECF No. 16, 21 (identifying termination as the only adverse action at issue in the case).)

F.3d 490, 493 (D.C. Cir. 2008). An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Baird v. Gotbaum,* 662 F.3d 1246, 1248 (D.C. Cir. 2011) (internal quotation marks and citation omitted).

In evaluating Title VII claims, courts in this jurisdiction typically apply the familiar burden allocation scheme that the Supreme Court adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See id.* at 802-803; *see also Stewart v. Ashcroft*, 352 F.3d 422, 428 (D.C. Cir. 2003) (applying *McDonnell Douglas* to Title VII discrimination claims). Pursuant to this scheme, a plaintiff must first demonstrate by a preponderance of the evidence that a prima facie case of discrimination exists. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981). If the plaintiff is able to establish a prima facie case, then the burden shifts to the defendant to proffer a non-discriminatory reason for the challenged employment action. *See McDonnell Douglas*, 411 U.S. at 802-803. Once the defendant offers such a reason, the burden shifts back to the plaintiff to demonstrate that the employer's non-discriminatory explanation is merely pretext for discrimination. *See id.* at 804.

Significantly, the D.C. Circuit has clarified that, "[i]n a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady*, 520 F.3d at 494 (emphasis in original). Instead, the court must simply determine whether the plaintiff has produced

"sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race[.]" *Id.*

In establishing whether a reasonable jury could find an employer's stated reasons for the challenged action was pretext for race discrimination, relevant evidence may include, *inter alia,* "'(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer).'" *Waterhouse v. Dist. of Columbia,* 298 F.3d 989, 993 (D.C. Cir. 2002) (quoting *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)). Evidence that an employer's "explanation is unworthy of credence" is certainly "probative of intentional discrimination" and may, "[i]n 'appropriate circumstances,'" lead a reasonable jury to infer "'that the employer is dissembling to cover up a discriminatory purpose.'" *Czekalski v. Peters*, 475 F.3d 360, 366 (D.C. Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)). However, even where a plaintiff alleging racial discrimination produces evidence that an employer's proffered explanation is false—*i.e.*, pretextual—the plaintiff "must still provide sufficient evidence that the [employer's] proffered explanation is pretext for *racial* discrimination." *Evans v. Sebelius*, 716 F.3d 617, 623 (D.C. Cir. 2013) (emphasis in original). Title VII "does not authorize a federal court to become a 'super-personnel department that reexamines an entity's business decisions[,]'" *Barbour v. Browner,* 181 F.3d 1342, 1346 (D.C. Cir.1999) (quoting *Dale v. Chi. Trib.*

*Co.,* 797 F.2d 458, 464 (7th Cir.1986)), and reviewing courts "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive[,]'" *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Milton v. Weinberger,* 696 F.2d 94, 100 (D.C. Cir. 1982)).

Furthermore, in an employment discrimination case where the plaintiff challenges his termination and "'the person who made the decision to fire [the plaintiff] was the same person who made the decision to hire,'" courts in this jurisdiction have recognized that "it is difficult to impute to that person an invidious motivation that would be inconsistent with the decision to hire,' especially 'when the firing has occurred only a short time after the hiring.'" *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) (quoting *Waterhouse*, 298 F.3d at 996). This so-called "same actor inference" cuts against a finding of discrimination, but it is "just that, an inference, which cannot immunize the defendant from liability for subsequent discrimination[.]" *Ragsdale v. Holder*, 668 F. Supp. 2d 7, 23 (D.D.C. 2009) (internal quotation marks and citation omitted). However, this inference does "require the plaintiff to present further evidence to defeat the defendant's motion for summary judgment." *Id.* Moreover, while "far from dispositive," the fact that a plaintiff and the person who fired him "are members of the same protected class" also "'weighs against any inference of discrimination.'" *Washington v. Chao*, 577 F. Supp. 2d 27, 42 n.8 (D.D.C. 2008) (quoting *Hammond v. Chao*, 383 F. Supp. 2d 47, 58 (D.D.C. 2005), *aff'd*, 2006 U.S.App. LEXIS 13290 (D.C. Cir. May 22, 2006)).

2.      Johnson Has Failed To Offer Sufficient Evidence For A Reasonable
        Jury To Conclude That The Proffered Reason For Johnson's
        Termination Was Pretext For Race Discrimination

Johnson presses three main arguments in an attempt to overcome these presumptions and to establish a question of fact regarding whether Defendant's stated reasons for his termination—unsatisfactory performance and argumentative demeanor—were pretext for race discrimination.  First, Johnson argues that Burke, the individual directly responsible for his termination, gave conflicting reasons at different points in time for his decision to terminate Johnson, thus (in Johnson's view) giving rise to an inference that the reasons Defendant now proffers are pretextual.  (Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Br."), ECF No. 16, 26-27.)  Second, Johnson points to evidence that his actual performance and workplace demeanor were largely positive, which Johnson claims casts further doubt on Defendant's proffered non-discriminatory explanation for Johnson's termination.  (*Id.* at 24-25.)  Finally, Johnson argues that there was a general attitude of discrimination amongst his superiors at VETS, which he claims shows that Defendant's actual motivation for terminating Johnson was race discrimination.  (*Id.* at 28-29.)  The Court will address each of these contentions in turn.

          a.      *Burke Did Not Give Conflicting Reasons For Johnson's*
                  *Termination And Burke's Statements Are Insufficient To*
                  *Demonstrate Pretext For Race Discrimination*

Johnson contends that "Mr. Burke gave conflicting statements" regarding the reasons for his termination; specifically, that Burke stated first that Johnson was fired "to support the supervisor" then later said it was because Johnson "cannot do the work," and finally explained that the "reason for terminating [Johnson] was based on [Burke's] own dissatisfaction with [Johnson's] argumentative demeanor and his reported lack of performance."  (Pl.'s Suppl. Decl. ¶ 39.)  Johnson's reliance on Burke's supposedly

shifting rationales as evidence of pretext for race discrimination is grounded on the established principle that "evidence of alternate justifications tends to undercut the proffered explanation and may demonstrate pretext." *Ajisefinni v. KPMG LLP*, No. 11-123, 2014 WL 658405, at *8 (D.D.C. Feb. 12, 2014) (internal quotation marks and citation omitted).

This Court finds Johnson's evidence insufficient to raise a triable issue of fact as to whether Defendant's proffered reasons were actually pretext for race discrimination largely because a careful review of the record reveals that Johnson is wrong to cast Burke's statements regarding Johnson's termination as contradictory. As an initial matter, the Court notes that the only evidence Johnson cites for his contention that Burke's original reason for firing him was to "support" Langley is Johnson's own account of a conversation that is otherwise absent from the record. (*See* Pl.'s Br. at 27 (citing Pl.'s Suppl. Decl. ¶ 39).) Such self-serving testimony is insufficient to create a genuine issue of material fact regarding whether an employer's proffered reason for termination was pretextual. *See Bennett v. Solis*, 729 F. Supp. 2d 54, 67 (D.D.C. 2010); *Fields v. Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007).

But even if Johnson's recounting of his initial conversation with Burke is accurate, there is still nothing contradictory about Burke's statements that he (1) fired Johnson to "support [Johnson's] supervisor" and (2) fired Johnson because Johnson could not "do the work." Indeed, it stands to reason that a part of Burke's support for Johnson's supervisor (Langley) might very well be support for her assessment that Johnson was unable to do the work required for his position in a timely fashion and without errors. Likewise, Burke's assertions that he terminated Johnson based on his

"own dissatisfaction with [Johnson's] argumentative demeanor"— which Burke maintained he "personal[ly] witness[ed]"—and based on Johnson's "reported lack of performance" do not contradict either of the other statements.  (Aff. of Gordon Burke Jr. ("Burke Aff."), Ex. 19 to Pl.'s Br., ECF No. 16-3 at 32-35, 33.)  Thus, the alleged inconsistency Johnson identifies is not an inconsistency at all, but rather a "refinement of a previously proffered explanation[,]" which, in and of itself, "is insufficient to demonstrate pretext." *Ajisefinni*, 2014 WL 658405, at *8.  Accordingly, this Court finds that a reasonable jury could not infer pretext—much less pretext for racial discrimination—based on Burke's allegedly shifting explanations for Johnson's termination.

> b.      *Johnson's Evidence Regarding His Job Performance And Workplace Demeanor Is Insufficient To Demonstrate Pretext For Race Discrimination*

Plaintiff also attempts to cast doubt on Defendant's stated reasons for Johnson's termination through testimony from his co-workers about his own job performance and workplace demeanor.  Regarding his job performance, Johnson relies in part on the testimony of his former supervisor at the Office of Special Programs and Emergency Preparedness, Walter Weatherington, who testified that Johnson had "performed all his duties in an outstanding manner" while in Weatherington's employ.  (Aff. of Walter Ozell Weatherington ("Weatherington Aff."), Ex. 13 to Pl.'s Br., ECF No. 16-3 at 1-3, ¶ 7.)  Johnson also points to statements by Angela Freeman, who worked closely with Johnson at VETS and apparently considered Johnson's work to be "excellent and extremely timely in manner."  (Aff. of Angela B. Freeman ("Freeman Aff."), Ex. 8 to Pl.'s Br., ECF No. 16-2 at 11-13, 12.)  Moreover, Johnson invokes the testimony of VETS co-worker Loretta Alston, whom Johnson trained, that Johnson was "very

competent." (Dep. of Loretta Jamese Alston ("Alston Dep."), Ex. 4 to Pl.'s Br., ECF

No. 16-1 at 24-36, 29:18-20.) Even Hecker conceded that Johnson "worked well when

assigned to coordinate and interact with others to complete an assignment[.]" (Aff. of

Patrick J. Hecker ("Hecker Aff."), Ex. 21 to Pl.'s Br., ECF No. 16-3 at 39-41, ¶ 8.)

 With respect to Plaintiff's demeanor, Hecker further testified that he did "not

recall any specific instances where [Johnson] was argumentative towards others." (*Id.*

¶ 10.) Plaintiff also notes that Burke told EEO Counselor Margaret Terry that Johnson

was "a good guy" with "a very favorable nature that's good in the work place[,]" (EEO

Counselor's Summ. Report ("EEO Counselor's Report"), Ex. 18 to Pl.'s Br., ECF

No. 16-3 at 28-30, 29), and that Langley testified that Johnson was not

"insubordinate[,]" (Dep. of Pamela K. Langley ("Langley Dep."), Ex. 2 to Pl.'s Br.,

ECF No. 16-1 at 13-19, 17:21-18:1). Moreover, VETS co-workers Loretta Alston, Jenel

Turner, and Linda Chambers all testified that they never witnessed Johnson being

argumentative at work. (Alston Dep. at 34:9-16; Dep. of Jenel Turner ("Turner Dep."),

Ex. 5 to Pl.'s Br., ECF No. 16-1 at 38-41, 40:19-21; Aff. of Linda Chambers

("Chambers Aff."), Ex. 6 to Pl.'s Br., ECF No. 16-2 at 2-6, ¶ 10.)

 Meanwhile, Defendant points to testimony that tells a largely different story.

With respect to Johnson's work performance, for example, Langley stated that Johnson

"consistently failed to follow [her] instructions for a given spreadsheet task, however

routine and basic" and that "numerous back-and-forth interactions with [Johnson] were

required in order to obtain an error-free work product." (Decl. of Pamela Langley

("Langley Decl."), Ex. 4 to Def.'s Mem. in Supp. of Mot. for Summ. J., ECF No. 14-1

at 34-40, ¶ 13.) Hecker testified that when Johnson worked independently the resulting

work product frequently "contained easily identified errors[,]" that he "was disappointed with [Johnson's] performance[,]" and that Hecker did "not believe that [Johnson] possesses the knowledge or organizational skills required of the position." (Hecker Aff. ¶¶ 8-9.) A contract employee assigned to work with Johnson at VETS, Ed Davin, testified to Johnson's "low level of skill with Excel and his correspondingly poor performance managing the various spreadsheet functions." (Aff. of Ed Davin, Ex. 8 to Def.'s Mem. in Supp. of Mot. for Summ. J., ECF No. 14-2 at 24-35, ¶ 7.)

In terms of Johnson's demeanor, Hecker, for his part, also testified that Johnson "would become defensive" when confronted with his own substandard work. (Hecker Aff. ¶ 10.) Langley also testified at length as to Plaintiff's "argumentative" demeanor. (Langley Decl. ¶¶ 9, 13, 14.) And Burke, the individual ultimately responsible for both hiring and firing Johnson, testified that Johnson "confronted many of [Burke's] attempts to help him by responding with a very argumentative demeanor[,]" (Burke Aff. at 35); that Johnson's "argumentative attitude" was "disruptive and inconsistent with good order and discipline" (Aff. of Gordon J. Burke Jr., Ex. 23 to Def.'s Mem. in Supp. of Mot. for Summ. J., ECF No. 14-4 at 23-25, ¶ 14); and that Johnson "was argumentative with his supervisor on a number of occasions[,]" (*id.*). Furthermore, Burke stated that he "found [Johnson] personally to be argumentative" because Johnson was "argumentative with [Burke] on three occasions where he was actually in [Burke's] office to discuss performance." (Dep. of Gordon John Burke, Jr. ("Burke Dep."), Ex. 2 to Def.'s Mem. in Supp. of Mot. for Summ. J., ECF No. 14-1 at 13-23, 17:9-14).

This Court finds, based on the foregoing evidence, that there is arguably a genuine dispute of fact about Plaintiff's job performance and workplace demeanor and,

thus, whether Defendant's proffered reasons for terminating Johnson were pretextual. However, Plaintiff's evidence does not speak to the question of whether Defendant's proffered reasons were pretext for *race discrimination* in the manner that the D.C. Circuit's *Brady* decision requires. And in the absence of any evidence tending to demonstrate that the real reason for Plaintiff's termination was discrimination on the basis of his race, Johnson's complaint cannot survive summary judgment. *See, e.g.*, *Evans v. Sebelius*, 716 F.3d at 623 (affirming in relevant part district court's grant of summary judgment on the grounds that evidence that defendant employer "gave conflicting and illegitimate reasons" for challenged action and failed to follow "proper protocols" was insufficient to support Title VII claim where plaintiff produced "no evidence" that employer's "proffered explanation [was] pretext for *racial discrimination*").

> c. *Johnson's Allegations Regarding General Discrimination At VETS Are Insufficient To Demonstrate That Johnson Was Terminated Because Of His Race*

Plaintiff points to one last set of evidence in an attempt to prove that Defendant's proffered reasons for Johnson's termination were pretext for race discrimination. Specifically, Johnson contends that both Langley and Hecker exhibited animus generally toward African American employees. The incidents Plaintiff cites as evidence of Langley's and Hecker's discriminatory attitudes generally fall into two categories: first, incidents in which Johnson was allegedly treated differently than his white co-workers, and second, incidents that, in Johnson's view, evince Langley's and Hecker's general discriminatory attitudes towards African-Americans. With respect to disparate treatment, Johnson points to the fact that Langley allegedly denied him the opportunity to accrue overtime hours but allowed white co-workers—specifically

Hecker—to do so.  (Pl.'s Suppl. Decl. ¶¶ 21-25.)  Johnson also asserts that Langley cancelled his scheduled training trip to the National Veteran's Training Institute, citing lack of funding, but allowed two white colleagues to make similar trips.  (Pl.'s Suppl. Decl. ¶ 26.)

With respect to Langley's and Hecker's alleged general discriminatory attitudes towards African Americans, Plaintiff primarily relies on the observations and experiences of several co-workers.  Angela Freeman testified that she repeatedly heard Langley and Hecker yell at Johnson and refer to him as "useless and stupid[.]" (Freeman Aff. at 12.)  Jenel Turner, another co-worker who had been with VETS for 14 years, witnessed Johnson's supervisors "dressing him down" in front of other co-workers, and also witnessed Hecker "talk down to minority employees" as though "their comprehension skills were limited."  (Aff. of Jenel M. J. Turner ("Turner Aff."), Ex. 12 to Pl.'s Br., ECF No. 16-2 at 38-40, ¶ 11.)  Plaintiff further claims that Hecker "degraded" African-American co-worker Loretta Alston by "insisting she sign her name multiple times in front of him until he could read it."  (Pl.'s Suppl. Decl. ¶ 17.)  Finally, Johnson points to evidence from his own experiences with Langley and Hecker.  First, Plaintiff states that as a general matter, Langley "acted tense and uncomfortable anytime she was" around him but "did not appear tense and uncomfortable around other white employees."  (*Id.* ¶ 18.)  Second, Plaintiff claims that Hecker told Johnson about a previous incident that took place "while Mr. Hecker was stationed overseas[,]" in which Hecker said he "directed some African-American soldiers to take out the garbage[,]" then "referred to the soldiers as lazy[,]" and subsequently had "an EEOC complaint" filed against him "for being racist."  (*Id.* ¶ 12.)

Co-worker testimony is a common feature of employment discrimination litigation, and in some circumstances, such evidence can be relevant to the question of whether an employee was subjected to discrimination. *See, e.g.*, *Nuskey v. Hochberg*, 723 F. Supp. 2d 229, 233 (D.D.C. 2010) (noting that "[e]vidence of an employer's past discriminatory or retaliatory behavior toward other employees" might be admissible at trial as relevant to the question of "whether an employer discriminated or retaliated against a plaintiff") (citation omitted). However, unsubstantiated co-worker testimony alone is generally insufficient to raise a question of material fact regarding pretext at the summary judgment stage. *See, e.g.*, *Ransom v. Ctr. For Nonprofit Advancement*, 514 F. Supp. 2d 18, 27 (D.D.C. 2007) (conclusory testimony of co-worker regarding discrimination against plaintiff was not "actual evidence" of pretext); *Chung v. Washington Metro. Area Transit Auth.*, No. 04-0366, 2007 WL 1154084, at *3 (D.D.C. Apr. 18, 2007) (co-worker testimony that plaintiff failed to receive promotion based on race and gender was not probative of pretext); *Carter v. Rubin*, 14 F. Supp. 2d 22, 42 (D.D.C. 1998) (finding that "broad allegations" of discrimination within a government agency "have no bearing" on the question of pretext).

Here, the testimony of Johnson's co-workers falls far short of raising a question of material fact because, even if the Court credits these statements, they do not bear directly on the issue at hand—namely, whether the proffered reasons for *Johnson's termination* were pretext for race discrimination. For example, Jenel Turner, the co-worker with what is arguably the strongest testimony regarding potentially discriminatory practices within VETS, conceded that she was "not privy to any of the underlying facts, factors, issues or details that could potentially warrant Mr. Johnson's

termination[.]" (Turner Aff. ¶ 12.) And Freeman's testimony regarding Langley's and Hecker's behavior toward Johnson fails to connect that behavior to Johnson's ultimate termination. Consequently, Turner's and Freeman's testimony are insufficient to show that Defendant's stated reasons for Johnson's termination were pretext for racial discrimination. Johnson's own testimony is similarly deficient because he has failed to demonstrate that his allegations that Hecker degraded Alston, that Langley appeared to be uncomfortable around him, and also that Hecker once told a story about being accused of racism, are causally connected to his termination. *See, e.g.*, *Bolden v. Clinton*, 847 F. Supp. 2d 28, 38 (D.D.C. 2012) (granting summary judgment where plaintiff failed to draw any "causal connection" between termination and race); *Laurent v. Bureau of Rehab., Inc.,* 544 F.Supp.2d 17, 23 n.5 (D.D.C.2008) (finding that plaintiff could not establish pretext where "she [was] unable to show any causal connection between her complaints about a fellow employee's conduct and her dismissal").

In a similar vein, Johnson's evidence regarding his alleged disparate treatment— namely, that Hecker was allowed to accrue overtime hours while Johnson was not and that two white co-workers were allowed to attend training conferences while Johnson was not—fails to raise a genuine question of fact as to whether Johnson's termination was based on race discrimination. Even setting aside the significant question of whether these other employees were "similarly situated" to Johnson, *see, e.g.*, *Kassim v. Inter-Cont'l Hotels Corp.*, No. 12-01663, 2013 WL 6154115, at *5 (D.D.C. Nov. 25, 2013), the purported disparate treatment evidence has no apparent connection to the proffered reasons for Johnson's termination and is therefore insufficient to show that those reasons were pretextual.

All things considered, this Court finds that Plaintiff has failed to demonstrate a genuine issue of material fact regarding whether Defendant's proffered non-discriminatory reasons for terminating Johnson are pretext for race discrimination. Accordingly, the Court will enter summary judgment in favor of Defendant as to Count I.

**B.      Hostile Work Environment Based on Race and Color (Count II)**

Johnson's second claim for relief alleges that he was subjected to a "hostile work environment based on his race and color in violation of Title VII." (Compl. ¶¶ 76-77.) For the reasons explained below, Johnson has failed to adduce facts sufficient to sustain his hostile work environment claim, both because the facts upon which he bases his claim are not extreme enough to satisfy the applicable standard, and also because Johnson has failed to establish any link between the allegedly hostile acts and race discrimination.

1.      Framework For Establishing A Hostile Work Environment Claim

To succeed on a hostile work environment claim, "a plaintiff must show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Baloch v. Kempthorne,* 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation omitted)).  "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  *Id.* (citation omitted).  "In addition, the plaintiff 'must always prove that the conduct at issue was not merely tinged with offensive connotations, but actually

constituted discrimination because of' the employee's protected status." *Peters v. Dist. of Columbia*, 873 F. Supp. 2d 158, 188 (D.D.C. 2012) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). "It is . . . important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination" lest "the federal courts . . . become a court of personnel appeals." *Lewis v. Dist. of Columbia*, 653 F. Supp. 2d 64, 80 (D.D.C. 2009) (quoting *Bryant v. Brownlee*, 265 F. Supp. 2d 52, 63 (D.D.C.2003) (citation omitted)). Indeed, "[t]he standards for finding a workplace illegally hostile are sufficiently demanding" *precisely because* courts must "ensure that Title VII does not become a general civility code." *Brooks v. Grundmann*, 851 F. Supp. 2d 1, 6 (D.D.C. 2012) (internal quotation marks and citations omitted).

2. <u>The Record Evidence Does Not Establish That Johnson Was Subjected To A Hostile Work Environment</u>

To support his hostile work environment claim, Johnson points to a number of workplace incidents involving his relationships with Langley and Hecker. First, Johnson claims that Hecker once humiliated him by talking down to him "as if he were a child" and "raised his voice at" Johnson on multiple occasions. (Pl.'s Suppl. Decl. ¶¶ 55-56.) Then, Johnson alleges that both Hecker and Langley wrongly accused him of making errors in reports and spreadsheets. (*Id.* ¶¶ 57-58.) Next, Johnson alleges that Langley repeatedly "yelled at" or spoke "angrily" to him (*id.* ¶¶ 58, 59, 61), and that, on one occasion, Langley "glared at [him], balled up both of her fists, and threw two catalogs down towards" him (*id.* ¶ 60). Finally, Johnson again invokes the story Hecker allegedly told Johnson about being accused of "racism" by African-American soldiers

while stationed overseas.  (Pl.'s Br. at 18 (citing *id.* ¶ 12).)  Johnson claims that

Langley and Hecker did not subject his white co-workers to the same behavior.  (*Id.*)

    After reviewing the "totality of the circumstances" presented by this case, *see*

*Baloch*, 550 F.3d at 1201, this Court concludes that that Johnson's alleged experiences,

even if true, are insufficient as a matter of law to support a hostile work environment

claim under Title VII.  As noted above, such a claim arises from conduct that

"permeated" the workplace "with discriminatory intimidation, ridicule, and insult that is

sufficiently severe or pervasive to alter the conditions of the victim's employment and

create an abusive working environment." *Harris*, 510 U.S. at 21 (internal quotation

marks and citations omitted).  Here, even when viewing the facts in the light most

favorable to Johnson and taking as true his experiences of being "yelled at,"

"scrutinized," and called "stupid" behind his back, the Court cannot find that these

experiences, although obviously unpleasant and highly questionable, constitute the type

of hostile and abusive workplace environment that gives rise to a claim under Title VII.

    It is well established that the "demanding standard for a hostile work

environment claim[,]" *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 78 (D.D.C. 2013),

requires much more.  Indeed, conduct far more egregious than what Johnson describes

has been found to fall short of establishing a hostile work environment. *See, e.g.*,

*Beshir v. Jewell*, 961 F. Supp. 2d 114, 128 (D.D.C. 2013) (facts were insufficient to

establish a hostile work environment where employee was yelled at on a daily basis

causing her to seek medical attention, was subjected to aggressive pressure to violate

federal regulations, was threatened with career setbacks, and was accused of threatening

her supervisor and suspended); *Franklin v. Potter*, 600 F. Supp. 2d 38, 77 (D.D.C.

2009) (a hostile work environment was not sufficiently established even though the "employee and his immediate supervisor repeatedly butted heads," "the supervisor frequently yelled at [the employee] during discussions about his work," and "the supervisor threatened [the employee] with job-related consequences for his refusals to meet workplace expectations") (internal quotation marks and citations omitted); *see also Dudley v. Washington Metro. Area Transit Auth.*, 924 F. Supp. 2d 141, 171 (D.D.C. 2013) (discussing "[a] litany of cases show[ing] that simply having a rude, harsh, or unfair boss is not enough for a hostile work environment claim"). It is clear beyond cavil that "[c]riticisms of a subordinate's work and expressions of disapproval (even loud expressions of disapproval) are the kinds of normal strains that can occur in any office setting" and the fact that a plaintiff was "spoken to in a condescending manner, although perhaps disrespectful and unfair, also does not mean that [the plaintiff] was subjected to an illegal hostile work environment." *Singh v. U.S. House of Reps.*, 300 F. Supp. 2d 48, 56-57 (D.D.C. 2004). The alleged hostile acts in the instant case, similarly, were not frequent, severe, or offensive enough to qualify as a hostile work environment.

Moreover, and just as significant, Johnson does not provide enough evidence from which a reasonable juror could infer that the alleged hostile acts were prompted by his race. *See, e.g.*, *Beshir*, 961 F. Supp. 2d at 129 (concluding plaintiff failed to demonstrate hostile work environment because she "failed to link any of the allegedly hostile workplace experiences to her race or sex"); *Lewis,* 653 F. Supp. 2d at 80 (noting that it is "important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of

discrimination") (citations omitted). While Johnson alleges that he faced a "heightened scrutiny" because of his race and color and that other white employees were not treated that way, there is little, if any, record evidence to support these contentions.[5] And without evidence that the hostile work environment that Johnson alleges he was subjected to was made so *because of* racial animus, Johnson's hostile work environment claim fails. *Cf. Baloch,* 550 F.3d at 1201 (considering as part of the totality of the circumstances that "none of the comments or actions directed at [the plaintiff] expressly focused on his race, religion, age, or disability—unlike in some hostile work environment cases").

In sum, upon review of the entire record, this Court cannot conclude that Johnson's experiences rose above "the ordinary tribulations of the workplace" to constitute the type of abusive discriminatory conduct necessary to sustain a hostile work environment claim, *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted), nor has Johnson successfully linked his negative workplace experiences to evidence of discrimination based on his race or color. Accordingly, the Court will enter summary judgment in favor of Defendant as to Count II of the complaint.

---

[5] The one instance Johnson cites in his brief opposing summary judgment as evidence of a hostile work environment that does directly implicate race is that Hecker allegedly called African-American soldiers "lazy" when he was stationed overseas and those soldiers filed an EEO claim against him for being racist. (Pl.'s Br. at 18 (citing Pl.'s Supp. Decl. ¶ 12).) This one instance, however, clearly falls short of substantiating Johnson's hostile work environment claim for several reasons. First of all, it occurred nearly three decades ago and, thus, bears no relevance to Plaintiff's own employment at DOL. In addition, the event was neither directed toward Plaintiff nor his work, and even so, having occurred only once, it does not amount to "severe and pervasive" harassment requisite for a hostile work environment claim. Moreover, Defendant notes that the EEO claim was "fully investigated by the Army and found to be without merit[,]" and was the only complaint made against Hecker during his 20 years of service in the Army. (Def.'s Reply to Pl.'s Br., ECF No. 18, 8 (citation omitted).)

## IV.     CONCLUSION

Johnson's brief tenure at VETS was marked by dissatisfaction on the part of all parties involved—Johnson with the management style of Langley and Hecker, and Langley and Hecker with Johnson's attitude and work product.  Plaintiff's evidence clearly establishes that there was a breakdown in the relationship between these individuals, but it does not raise a reasonable inference that race discrimination played a part in the outcome.  Consequently, as set forth in the separate order accompanying this Opinion, Defendant's motion for summary judgment is **GRANTED** and the Court will enter judgment against Johnson as to both counts.


DATE:  September 2, 2014              *Ketanji Brown Jackson*
                                      KETANJI BROWN JACKSON
                                      United States District Judge